**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| **TBYRD Enterprises, L.L.C.,** | § | **Case No.  06-30078-H1-11** |
| **Debtor.** | § | |
| | § | |
| **BFG Investments, L.L.C.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adv. Pro. 05-07029** |
| | § | |
| **Texas State Bank,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION REGARDING SANCTIONS AGAINST TIM W. BYRD,**
**THOMAS G. WAYLAND, JOHN E. VILLEGAS, AND KELLY K. MCKINNIS**

For the reasons set forth below, the Court finds that Tim W. Byrd, Thomas G. Wayland, John E. Villegas, and Kelly K. McKinnis must be sanctioned.

On January 25, 2006, the United States Trustee filed its motion to show cause in the TByrd bankruptcy case.  On February 8, 2006, this Court issued its show cause order.  At the hearing on February 8, 2006, the parties stipulated that notice of the scheduled March 8, 2006 hearing was adequate.  On March 8, 2006, the Court conducted an evidentiary hearing on whether sanctions should be issued.

Having fully considered the evidence against the parties, the Court concludes that it must issue sanctions against the parties.  In addition, the Court concludes that it has several independent duties that are invoked as a consequence of the evidence adduced on March 8, 2006. First, the Court must meet its criminal referral duty to the United States Attorney that is imposed by 18 U.S.C. § 3057(a).  Second, the Court must report Mr. Wayland's conduct and Mr.

1

McKinnis'[1] conduct to the State Bar of Texas pursuant to Rule 8.03 of the Texas Disciplinary Rules of Professional Conduct.  Third, the Court must report Mr. Wayland's conduct and Mr. McKinnis's[1] conduct to the District Court pursuant to Rule 5 of the Rules of Discipline of the United States District Court of the Southern District of Texas.

## Overview and Summary of Findings

Bankruptcy cases are unique from other types of federal litigation.  One of the most important events in a bankruptcy case is the filing of the petition.  Unlike a civil complaint that requests relief after consideration by the Court, the filing of a bankruptcy petition results in two forms of automatic relief.  First, the filing of the petition constitutes the entry of an order for relief.  11 U.S.C. § 301.  Second, the filing of the petition by an eligible entity invokes the automatic stay—a congressionally imposed injunction.  11 U.S.C. § 362(a).

If a bankruptcy petition is filed in bad faith, it nevertheless invokes the power of the congressionally imposed automatic stay.  Accordingly, the misuse of bankruptcy petitions is an extraordinarily serious issue.  Indeed, when Rule 9011 of the Federal Rules of Bankruptcy Procedure was amended in 1997 to provide a "safe harbor" comparable to the safe harbor under Rule 11 of the Federal Rules of Civil Procedures, no safe harbor was granted for the filing of a bankruptcy petition in violation of the rules.  FED. R. BANKR. P. 9011(C)(1)(A).

BFG Investments, LLC ("BFG") filed chapter 11 bankruptcy on March 1, 2005.  Its principal secured creditor was Texas State Bank.  On April 11, 2005, an agreed order was issued by the Bankruptcy Court[2] providing for the termination of the automatic stay if certain conditions

---

[1]  As set forth in more detail below, the Court ultimately concludes that Mr. McKinnis' conduct must be reported to the appropriate governing officials, but the Court does not recommend that any further action be taken with respect to Mr. McKinnis.

[2]  The Bankruptcy Judge in BFG's main bankruptcy case is the Honorable Richard Schmidt.

were not satisfied. The agreed order was modified on several occasions. Texas State Bank subsequently notified BFG of an alleged default of the order's required conditions.

BFG challenged the accuracy of the alleged default by commencing a state court lawsuit against Texas State Bank. The state court issued a temporary restraining order. Texas State Bank removed the state court lawsuit to this Court. Following the expiration of the state court temporary restraining order, Texas State Bank posted all of BFG's property for a state-law foreclosure sale to be conducted on January 3, 2006. On December 29, 2005, BFG sought injunctive relief from this Court. The Court conducted a hearing on December 30, 2005 and issued an agreed temporary restraining order. The agreed temporary restraining order expired by its own terms at the conclusion of a preliminary injunction hearing that was scheduled for 8:30 a.m. on January 3, 2006.

On January 3, 2006, this Court declined to issue the preliminary injunction.

Immediately following the preliminary injunction hearing, TByrd Enterprises LLC ("TByrd") filed a chapter 11 bankruptcy petition, claiming to be the owner of all of BFG's property.

### Burden of Proof

At the commencement of the evidentiary hearing on this matter, the United States Trustee suggested that the burden of proof was on the respondents in a show cause hearing. Nevertheless, the parties agreed that the hearing would begin with the United States Trustee establishing his case-in-chief.

Although a show cause hearing purports to command a respondent to "show cause," the title of the order setting a hearing should not control the substance of the hearing. The Fifth Circuit has long held that "the caption on a pleading does not constrain the court's treatment of a

3

pleading." *North Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 918 (5th Cir. 1996). The relief sought in a pleading "'should be determined by substance, not a label.'" *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (quoting *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 606 (5th Cir. 1963)); *see also Armstrong v. Capshaw, Gross & Bowers, LLP*, 404 F.3d 933, 936 (5th Cir. 2005). Further, Rule 8(f), made applicable to the present proceeding through Rule 7008, states: "[a]ll pleadings shall be so construed as to do substantial justice." FED. R. CIV. P. 8(f); FED. R. BANKR. P. 7008.

To be sure, in some show cause hearings, the burden of proof may be on a respondent. For example, if a respondent has admittedly not complied with a court order, the respondent may claim that compliance is impossible. Because impossibility of performance is an affirmative defense, the burden of proof would be on the respondent.

That is not the situation presently before the Court. This is a traditional show cause hearing in which complex facts must be considered. The burden of proof rests on the United States Trustee. *See Sealed Appellant 1 v. Sealed Appellee 1*, 211 F.3d 252 (5th Cir. 2000).

The allegations made in this case are extraordinarily serious. The Court has considered— and in certain instances recommends—severe sanctions. Given the nature of the conduct and the remedies considered by the Court, the Court concludes that the United States Trustee must meet his burden by a clear and convincing standard. As the Fifth Circuit held in *Crowe v. Smith*, 261 F.3d 558 (5th Cir. 2001):

> In attorney suspension and disbarment cases, the finding of bad faith must be supported by clear and convincing proof. *See Thalheim*, 853 F.2d at 389 n.9. Clear and convincing proof is a high standard, requiring more than a preponderance of the evidence. *See In re: Medrano*, 956 F.2d 101, 102 (5th Cir. 1992). To support a finding of bad faith, the evidence must be so direct and weighty as to leave the fact finder with a firm belief in the truth of the facts of the case. *See id.*

4

*Crowe v. Smith*, 261 F.3d at 563.

In this case, the Court declines to issue sanctions unless they are supported by clear and convincing evidence.

## The Parties and Their Conduct

### John E. Villegas

Mr. Villegas is a McAllen businessman. He invests in and develops real property. Mr. Villegas is the majority equity owner in BFG Investments, LLC, and he was its chief operating officer and manager. He testified before this Court at the January 3, 2006 preliminary injunction hearing and at the sanctions hearing held on March 9, 2006.

When BFG filed chapter 11 bankruptcy on March 1, 2005, BFG became the debtor-in-possession of the BFG bankruptcy estate. As its principal manager, Mr. Villegas served as a fiduciary to the estate. Mr. Villegas never took his fiduciary responsibilities seriously. At the injunction hearings conducted on December 30, 2005 and on January 3, 2006, it became apparent that Mr. Villegas paid little heed to the agreements that BFG had made with Texas State Bank, which agreements were reflected in agreed orders issued by the Bankruptcy Court. Mr. Villegas had taken inadequate steps to insure compliance with the orders and had allowed estate property to be uninsured.[3]

The events that give rise to the sanctions against Mr. Villegas arose after the December 30, 2005 hearing and before 10:00 a.m. on January 3, 2006. On January 2, 2006, Mr. Villegas first met with Thomas Wayland. He was introduced to Mr. Wayland by BFG's lawyer, Kelly

---

[3]  Mr. Villegas alleges that this problem is attributable to his insurance agent. The Court expresses no view on this issue. However, it is apparent that after receiving notice from the Bank, Mr. Villegas still took no effective action to correct the insurance problem for many weeks.

McKinnis. The meeting with Mr. Wayland began around 10:00 p.m. on January 2, 2006. The meeting resumed at about 7:00 a.m. on January 3, 2006. The preliminary injunction hearing was scheduled for 8:30 a.m. on January 3, 2006.

Sections 363(b) and (c) of the Bankruptcy Code authorize a chapter 11 debtor to enter into transactions outside of the ordinary course of business only with court approval after notice and hearing. These provisions assure that transactions out of the ordinary course of business are scrutinized by the creditors of the estate and reviewed by the Court.

Notwithstanding the unambiguous requirements of § 363, Mr. Villegas deeded *all* of the estate's tangible assets (save and except for a small cash balance in the bank) to TByrd Enterprises, LLC when the meeting resumed on January 3, 2006. No approval was sought for this transaction; Mr. Villegas did not disclose the transaction to the Court or to BFG's creditors. Indeed, Mr. Villegas failed to even tell BFG's lawyer, Mr. McKinnis, before he executed the deed to TByrd. In exchange for the deed, BFG received a note, secured by a wraparound mortgage, with a face value of $1,000,000.

When he was negotiating with Mr. Wayland for the sale of the property, Mr. Villegas made Mr. Wayland commit that if the preliminary injunction hearing resulted in an unfavorable outcome, Mr. Wayland would place TByrd into bankruptcy in order to stop the pending foreclosure proceeding.

Immediately after selling all of the estate's assets, Mr. Villegas attended the 8:30 a.m. preliminary injunction hearing before the Court. The issue before the Court was whether a preliminary injunction should be issued in order to stop Texas State Bank from foreclosing on BFG's real estate. It is elementary that BFG, acting through Mr. Villegas, should have disclosed that it no longer owned the real estate when BFG appeared at the preliminary injunction hearing.

Instead, Mr. Villegas committed perjury at the January 3, 2006 hearing. On cross examination by Texas State Bank's lawyer, he testified that the list filed by his attorney of properties owned by BFG "is true and correct." In fact, at the time of Mr. Villegas' testimony, the list was wholly false and misleading. BFG owned none of the properties on the list; within the previous 90 minutes, Mr. Villegas had executed a deed transferring all of the properties.

At the conclusion of the January 3, 2006 hearing, the Court concluded that BFG had not provided the required insurance. This fact meant that BFG had breached the agreed order with Texas State Bank. Consequently, the Court declined to issue the preliminary injunction.

As Mr. Villegas left the United States Courthouse after the Court declined to issue the preliminary injunction, Mr. Villegas borrowed Mr. McKinnis' cell phone and called Mr. Wayland. Mr. Villegas demanded that Mr. Wayland place TByrd into bankruptcy, as previously agreed.

To be sure, Mr. Villegas denies that he ever discussed a bankruptcy filing with Mr. Wayland. The Court concludes that Mr. Villegas is again lying to the Court. Based on the credibility of the witnesses, the Court rejects Mr. Villegas' testimony.

**Thomas Wayland**

Mr. Wayland is a McAllen attorney, licensed to practice by the State of Texas (State Bar No. 20989100) and admitted to practice in the Southern District of Texas (Admission # 12189). In recent years, Mr. Wayland has suffered through both medical and personal issues. Although no details were offered into evidence, Mr. Wayland suffered a stroke and takes medication. He is recently divorced. His grandmother died in the last week of 2005, just before the events that give rise to the sanctions issue before the Court.

Mr. Wayland has not been active in the bankruptcy courts.  In August 2005, he attended an advanced business bankruptcy seminar for CLE credit.  However, he was simultaneously bored and confused by the matters discussed at the seminar.

Mr. Wayland typically represents Mexican investors wishing to invest funds in distressed businesses in the United States.  On several occasions, Mr. Wayland stressed to the Court that he does not ask the source of his clients' funds, because he does not want to know the answer.  The Court concludes that Mr. Wayland believes that his clients are attempting to funnel moneys from illegal operations into the United States.

The Mexican investor in the TByrd transaction was Mr. Angel Sanchez Torres.  Mr. Sanchez Torres deposited $450,000 in certified funds with Mr. Wayland.  Mr. Wayland was given a power of attorney for Mr. Sanchez Torres and held complete discretion to invest the funds.

In the TByrd matter, Mr. Wayland served as the principal business decision maker and the sole lawyer.  Accordingly, he holds primary responsibility for all of TByrd's conduct.  Mr. Wayland acted through his power of attorney to make all decisions for TByrd.  Those decisions included (1) buying the TByrd corporate shell from Mr. Byrd in the 10-days prior to the acquisition of BFG's assets; (2) acquiring substantially all of BFG's assets; and (3) placing TByrd into a voluntary chapter 11 bankruptcy case.  Mr. Wayland also provided all of the legal advice to TByrd with respect to these actions.

Mr. Byrd had been Mr. Wayland's client in an unrelated case.  The two became friends and Mr. Byrd began working as a consultant for Mr. Wayland.  Mr. Byrd would run business operations for companies acquired by Mr. Wayland's clients, perform tasks as requested by Mr. Wayland, and generally operate as requested by Mr. Wayland.

As Mr. Wayland's foreign clients did not want to incorporate new companies for their U.S. investment activities, Mr. Wayland acquired dormant corporate shells as investment vehicles for his clients. Accordingly, in the last few days of 2005, Mr. Wayland used his power of attorney from Mr. Sanchez Torres to acquire TByrd. He paid Mr. Byrd $1,000 of Mr. Sanchez Torres's funds.

On January 2, 2006, Mr. Wayland first learned that Mr. Villegas was desperate to find a buyer for BFG's real estate. Between 10:00 p.m. on January 2, 2006 and 7:30 a.m. on January 3, 2006, Mr. Wayland made the decision that TByrd would purchase BFG's assets. Mr. Wayland called Mr. Byrd and retained him as a "consultant" in the TByrd matter. Mr. Wayland simultaneously forwarded a chapter 11 bankruptcy petition to Mr. Byrd and instructed him to execute the petition. Mr. Wayland prepared the petition, listing Mr. Byrd as TByrd's "Managing Member." Mr. Byrd signed the petition, alleging that he held that position. In fact, Mr. Wayland was the only person with actual authority over TByrd.

At the same time that he learned of BFG's real estate, Mr. Wayland learned that BFG was a chapter 11 debtor. Mr. Wayland conducted no investigation into whether the Bankruptcy Court had authorized the sale of BFG's assets. Indeed, he was aware that there was a pending preliminary injunction hearing seeking to retain the assets in the estate. Mr. Wayland and Mr. McKinnis had been friends for many years, and Mr. Wayland knew that Mr. McKinnis was BFG's bankruptcy counsel. Nevertheless, Mr. Wayland failed to advise Mr. McKinnis that he was acquiring all of BFG's assets. Indeed, Mr. Wayland testified that he rushed to the county clerk's office to record the deed before BFG could change its mind about selling the property.

9

Mr. Wayland knew that he had placed the newly acquired real estate into a corporate shell with no other assets. Nevertheless, he caused BFG to file a chapter 11 petition within three hours of the time that it received the deed.

Mr. Wayland signed the chapter 11 petition as BFG's attorney. 11 U.S.C. § 327 requires that a chapter 11 debtor's counsel be "disinterested." Mr. Wayland—as the sole actor in making TByrd's business decision—was not disinterested. He failed to disclose his lack of disinterestedness.

**Timothy Byrd**

Mr. Byrd is a photographer and businessman. He was the founder of TByrd. As set forth above, he sold TByrd to Mr. Sanchez Torres in late December 2005.

In his first appearance before this Court, Mr. Byrd presented himself as merely an innocent former client who had been contacted by Mr. Wayland to sell his corporate shell. That characterization has proven inaccurate.

Mr. Byrd and Mr. Wayland work together on a regular basis. Mr. Wayland frequently hires Mr. Byrd as a business manager and consultant. Mr. Byrd is typically paid $20.00 per hour for his time.

Mr. Byrd willingly signed TByrd's bankruptcy petition. He knew when he signed it that it was false. Mr. Byrd was not the Managing Member of TByrd on the date that the petition was signed. Mr. Byrd—at Mr. Wayland's behest—also signed the deed of trust in which TByrd granted a lien to secure the $1,000,000 purchase money note. Mr. Byrd signed the $1,000,000 note.

Accordingly, in the space of a few hours, Mr. Byrd willingly executed a $1,000,000 promissory note by TByrd, a deed of trust for recording in the real property records, and TByrd's

chapter 11 bankruptcy petition. Mr. Byrd conducted absolutely no investigation. Instead, he blindly did as instructed by Mr. Wayland.

Mr. Byrd is not so naïve that he would believe that he should be executing documents of such obvious import with absolutely no investigation. He portrays himself as an innocent victim. The Court finds him to be a willing actor.

**Kelly McKinnis**

Mr. McKinnis is a McAllen lawyer, licensed to practice law by the State of Texas. He is admitted to practice before the United States District Court for the Southern District of Texas. Mr. McKinnis has a varied practice, including an active practice before the United States Bankruptcy Court for the Southern District of Texas. Mr. McKinnis is a sophisticated attorney who regularly appears before the undersigned judge.

Mr. McKinnis was approved to serve as BFG's counsel by order entered on April 11, 2005. BFG's bankruptcy case was converted to a case under chapter 7 on January 5, 2006. Until the case was converted, Mr. McKinnis remained as counsel to the debtor in possession.

In late 2005, Mr. Villegas approached Mr. McKinnis and inquired about selling the estate's assets under § 363 without a court order. Mr. McKinnis told Mr. Villegas that such an action would be illegal and that he could not do so. On further consideration, however, Mr. McKinnis changed his advice to Mr. Villegas. He informed him that, although Mr. McKinnis advised against any attempt to sell the assets under § 363 without a court order, Mr. McKinnis did not believe that such an action would be illegal.

In the waning days of 2005, Mr. McKinnis put Mr. Villegas in contact with Mr. Wayland. Mr. McKinnis knew that Mr. Wayland had clients who bought distressed assets and introduced Mr. Wayland to Mr. Villegas for the purpose of discussing such a transaction. Prior to the 8:30

a.m. January 3, 2006 hearing, Mr. McKinnis was not informed that an agreement had been reached and was not informed that Mr. Villegas had executed documents transferring the properties.

Following the Court's denial of the issuance of the preliminary injunction, Mr. Villegas informed Mr. McKinnis of the property sale that had already occurred. Mr. McKinnis lent his cell phone to Mr. Villegas so that he could call Mr. Wayland. Mr. Villegas instructed Mr. Wayland to file TByrd's bankruptcy petition.

However, Mr. Wayland's computer printer malfunctioned and he could not print the petition. Mr. Wayland begged Mr. McKinnis for assistance. Mr. McKinnis refused to help and the two had a heated exchange. Mr. Wayland implored Mr. McKinnis for assistance—arguing that the two were long-time friends, that Mr. Wayland's grandmother had just died a few days before, and that Mr. Wayland was distraught. Mr. McKinnis relented, typed the petition, and filed the petition in the Southern District of Texas. The petition bore Mr. Wayland's signature and Mr. Byrd's signature. But for Mr. McKinnis' conduct, the petition would not have been filed.

### The Wrongful Nature of the Conduct

**The Asset Transfer**

The transfer of all of BFG's assets to TByrd without court approval violated 11 U.S.C. § 363. Mr. Villegas violated his fiduciary duty to the estate. He was assisted in these violations by Mr. Wayland and Mr. Byrd.

Mr. McKinnis gave legal advice that, although the transfer should not occur, it would not be illegal. He was correct that the transfer should not occur; he was incorrect in advising that the transfer was not illegal. Mr. McKinnis's error in the legality of the transaction may be actionable

12

and may justify the denial of his fees in BFG's bankruptcy case.[4]  However, it does not give rise to a sanctions issue under Rule 9011 or the Court's inherent power.  He advised the client of the correct ultimate course and the client declined to follow the advice.  The Court will not impose a sanction for the error in legal advice.

In addition to violating 11 U.S.C. § 363, the Court also concludes that the facts described in testimony before the Court give rise to criminal violations.  18 U.S.C. § 152(5) makes it a crime to "knowingly and fraudulently receive[] any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11."  Mr. Villegas, Mr. Wayland and Mr. Byrd willfully transferred property out of BFG's bankruptcy estate with the intent to defeat the provisions of title 11.  The Court had not approved the transfer and had refused to issue an injunction barring Texas State Bank from exercising its rights as a secured creditor.

**The Preliminary Injunction Hearing**

Mr. Villegas was an active participant in the preliminary injunction hearing.  He appeared at the hearing seeking an injunction to avoid irreparable injury to BFG.  However, before the commencement of the hearing, he had transferred away BFG's assets.

When asked about ownership of the assets, Mr. Villegas lied and claimed that BFG owned the assets.  Even if he had not been asked, as the fiduciary to BFG's estate, he had a duty of disclosure to the Court.

Mr. Villegas' perjury at the hearing is sanctionable.  No other party is responsible for Mr. Villegas' conduct at the preliminary injunction hearing.

---

[4]  The Honorable Richard S. Schmidt is presiding over BFG's main bankruptcy case.  The issue of whether to award fees to Mr. McKinnis is up to Judge Schmidt.

**The TByrd Bankruptcy Petition**

The TByrd bankruptcy case was filed on the 20th anniversary of the issuance of the Fifth

Circuit's seminal opinion on bad faith chapter 11 bankruptcy filings. *In re Little Creek Dev. Co.,*

779 F.2d 1068 (5th Cir. 1986)[5]. During the 20 years that have passed since *Little Creek,* the case

has become settled law. Some of *Little Creek's* important teachings are:

- [T]he bankruptcy court has the power to raise the issue of good faith *sua sponte* as an inquiry into its jurisdiction, and former Bankruptcy Act precedent in this circuit confirms their position. *See In re Metropolitan Realty Corp.,* 433 F.2d 676, 679 (5th Cir.1970) (Wisdom, J.) ("As soon as the lack of good faith affirmatively appeared, the district court acted properly in dismissing the petition even though the plan stage had not been reached") (citations omitted), cert. denied, 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971); *Southern Land Title Corp. v. Mitchell,* 375 F.2d 874, 877 (5th Cir.1967). [*Little Creek,* 779 F.2d at 1071, n.1]

- Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings. [*Id.* at 1071]

  Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes. [*Id.* at 1072]

- Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually

---

[5]   *Little Creek* was issued by the Fifth Circuit on January 3, 1986. TByrd's bankruptcy petition was filed on January 3, 2006.

been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases. [*Id.* at 1072-73]

The filing of the petition in *this* case exemplifies the worst of the bad faith cases. The debtor's corporate shell was acquired on the eve of bankruptcy. The debtor had $0.00 in capital. Within 2.5 hours of the filing of the petition, the debtor acquired all of its assets. The debtor's recently acquired properties were posted for foreclosure at 10:00 a.m. and the petition was filed at 9:55 a.m. on January 3, 2006. The debtor had a straw man as its manager, no employees, and no creditors other than Texas State Bank and BFG (who held a note executed on the morning of the filing of the bankruptcy petition). The debtor's predecessor was in bankruptcy and had lost its efforts to reorganize; its efforts at obtaining injunctive relief had failed. The debtor acquired its property from BFG in knowing violation of the law. The debtor is unable to produce a single book or record. The debtor's attorney (and *de facto* principal) testified that the sole reason for filing the bankruptcy case was to force Texas State Bank to negotiate.

Notwithstanding the foregoing, Mr. Wayland and Mr. Villegas decided that this bankruptcy case should be filed. Without the assistance of Mr. Byrd and Mr. McKinnis, the filing could not have occurred. The filing was in bad faith and was abusive. Its sole purpose was to achieve delay and to find a way to avoid the effects of the orders issued in BFG's bankruptcy case.

The petition was filed under penalty of perjury. It falsely identified Mr. Byrd as the Managing Member of the LLC. The filing of a knowing and fraudulent oath on a bankruptcy petition violates 18 U.S.C. § 152(3). Moreover, the filing of the TByrd petition was done for the purpose of consummating the fraudulent transfer of assets out of BFG. Accordingly, the filing of the petition violated 18 U.S.C. § 157(1).

### Determination of Appropriate Sanctions

In determining appropriate sanctions, the Court should limit the sanction to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. FED. R. BANKR. P. 9011(c). *In re Porcheddu*, --- B.R. ----, 2006 WL 360530, at *10 (Bankr. S.D.Tex. 2006).

This Court has the inherent authority to regulate the practice of litigants and lawyers appearing before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

The Court has examined what sanctions have been imposed by other courts. Frequently the amount of sanctions are determined by examining opposing counsel's attorneys fees. In general, this Court rejects fee shifting as the only appropriate measure of sanctions. The fees incurred by others may or may not properly measure the amount that is appropriate to deter future wrongful conduct by a party. *Fox v. Acadia State Bank*, 937 F.2d 1566, 1571 (11th Cir. 1991). When the sanctions are imposed on the Court's own motion, it may be inappropriate to examine the Court's own cost of operation as an appropriate measure. *Blue v. United States Dep't of Army*, 914 F.2d 525, 548 (4th Cir. 1990). Accordingly, the Court will examine the particulars of the conduct, the party, and the required deterrent in order to assess an appropriate sanction.

In *Chambers,* the Supreme Court affirmed the imposition of sanctions of $996,644, disbarment and suspension for bad faith conduct of a defense of a contract suit. *Chambers,* 501 U.S. at 55-58. In that case, the monetary award was based on a measure of opposing counsel's fees, but additional sanctions were added to assure proper deterrence. In other cases, sanctions have been limited to an admonishment of counsel. However, admonishments are generally limited to situations that are substantially less egregious than the conduct before this Court. *Traina v. U.S.,* 911 F.2d 1155, 1158 (5th Cir. 1990) (reprimand for reliance on inapplicable case law); *Cargile v. Viacom Int'l, Inc.,* 282 F. Supp. 2d 1316, 1320 (N.D. Fla. 2003) (reprimand for filing frivolous pleading where counsel subsequently advised client to dismiss case and it was counsel's first Rule 11 violation); *Miller v. Norfolk So. Ry. Co.,* 208 F. Supp. 2d 851, 854 (N.D. Ohio 2002) (reprimand for filing frivolous motion to reconsider which simply repeated earlier arguments); *Jenkins v. Methodist Hosp. of Dallas, Inc.,* 2004 WL 2871006, at *2 (N.D. Tex. Dec. 14, 2004) (reprimand for failure to proofread brief and correct erroneous quotation upon discovery of error).

**John E. Villegas**

At the show cause hearing, Mr. Villegas had the opportunity to present any evidence that he chose. His case was severely lacking. In addition to failing to defend the substance of the allegations, Mr. Villegas also failed to express any regret or remorse for his conduct. As set forth in detail above, Mr. Villegas' conduct was substantial and abusive.

In determining the appropriate sanction, the Court considered both monetary and non-monetary sanctions. Based on the nature of his conduct, the Court finds that neither solely monetary sanctions nor solely non-monetary sanctions would be appropriate.

Mr. Villegas claims to have no concept that what he did was wrong. Although the Court finds his conduct intentional and his testimony untruthful, it is also apparent that, even now, Mr. Villegas apparently fails to fully confront the reality of what he did. If the Court imposed only monetary sanctions, the Court believes that there is a substantial risk that Mr. Villegas would return to the bankruptcy court and commit similar wrongful acts again. Monetary sanctions alone would be insufficient. Accordingly, the Court finds that any effective deterrent against Mr. Villegas requires a form of pre-filing review.

In Mr. Villegas' case, one appropriate non-monetary sanction is to require him—permanently—to obtain advance, written approval from a United States Bankruptcy Judge or a United States District Judge before he, or any entity controlled by him (directly or indirectly) files a petition under Title 11. Such a pre-filing review will protect the Court against further invocations of the automatic stay by bad faith filings, and will allow the Court to condition any filing by an entity controlled by him with appropriate safeguards. For example, given the breadth of his breach of fiduciary duty in the BFG case, it would allow the Court to require the immediate appointment of a trustee in a future case, if such appointment were appropriate.

The second non-monetary sanction that must be issued against Mr. Villegas is merely one that restates the law. All of BFG's property is now under the control of the chapter 7 trustee appointed in BFG's bankruptcy case. 11 U.S.C. § 362(a) bars any person from exercising control of the estate's property. Section 362 serves as a congressionally imposed injunction. *In re All Trac Transp., Inc.*, 306 B.R. 859 (Bankr. N.D. Tex. 2004). Accordingly, Mr. Villegas is already enjoined from asserting any right to any property of BFG's estate.[6] To assure no

---

[6] Subsequent to the Court's January 10, 2006, order that granted Texas State Bank the authority to foreclose on its collateral and transferred possession of the collateral to Texas State Bank, Mr. Villegas sought a temporary

misunderstanding, the Court explicitly enjoins Mr. Villegas. At the sanctions hearing, claims were alleged to exist against insurance agents, insurance companies, banks and others. All of those rights and claims are controlled exclusively by the chapter 7 trustee. Mr. Villegas shall not commence or threaten any lawsuit or otherwise make demand against those parties with alleged liability to the estate. This injunction does not bar Mr. Villegas from asserting rights in the bankruptcy court as a party in interest in the bankruptcy case.

The non-monetary sanctions should effectively deter future wrongful conduct by Mr. Villegas, but will have little or no deterrent effect on others who are similarly situated. Given the magnitude of the wrong and the size of the assets that were controlled by Mr. Villegas, the Court requires Mr. Villegas to pay a sanction of $25,000. This sanction is intended to be sufficient to deter others who are similarly situated from similar misconduct. The Court recognizes that the $25,000 sanction is modest, given the conduct. Nevertheless, the purpose of the monetary sanction (in this case) is deterrence and the $25,000 should be sufficient warning to others. If the Court were authorized to punish Mr. Villegas for his conduct, the sanction would be much more severe.

In this case, given the criminal nature of the conduct, punishment should best be left to the appropriate authorities. Accordingly, pursuant to 18 U.S.C. § 3057(a), this Court reports this matter to the United States Attorney for the Southern District of Texas. The clerk shall forthwith transmit a copy of this memorandum opinion to the United States Attorney.

---

restraining order in state court. Moreover, after Mr. Villegas sold the property to TByrd, he then executed an earnest money contract to sell the properties to a third party. Although these events were not the subject of the show cause order and no sanctions are issued as a consequence of these events, they are relevant to understanding Mr. Villegas' motive in this case.

**Thomas Wayland**

Mr. Wayland failed to present any effective defense of his conduct at the show cause hearing. Indeed, his principal defense was to blame Texas State Bank because it refused to negotiate with him after the bad faith bankruptcy case was filed!

He also blamed the Court based on an order issued on January 10, 2006. The purpose of the January 10, 2006 hearing was to consider whether to grant relief from the automatic stay to allow Texas State Bank to foreclose on TByrd's assets. The motion sought authority to foreclose on everything owned by the debtor, with the hearing set only seven days after the filing of the petition. Mr. Wayland was debtor's counsel. He failed to appear at the hearing. Instead, he advised Texas State Bank's counsel to announce that the debtor was unopposed to the relief. The Court had never before seen such a display of a lack of concern in a chapter 11 bankruptcy case. If the case had any merit whatsoever, how could debtor's counsel intentionally fail to appear at the hearing—and how could a debtor who had filed a case with a good faith intent to reorganize not oppose the relief? Confronted with that situation, the Court ordered that Texas State Bank should have immediate possession and control of its collateral. One of Mr. Wayland's principal defenses was that the January 10, 2006 order precluded any effective negotiations between TByrd and Texas State Bank.

At the sanctions hearing, Mr. Wayland seemed to take pride in the fact that he looked the other way and asked no questions about the source of his clients' money. Whether he is right or wrong about the source of his client's money, Mr. Wayland assumes that he is operating as a money launderer for foreign clients. How could a licensed attorney take pride in such conduct, much less express such sentiments before a United States Bankruptcy Judge in a hearing in a United States Courthouse?

The Court recites the foregoing two paragraphs so that the reader will understand just how far removed Mr. Wayland's sense of propriety is from reality.  To be sure, he regrets that he is in trouble; however, he has absolutely no concept as to why he is in trouble.

Mr. Wayland is licensed to practice law in the State of Texas and in the United States District Court for the Southern District of Texas.  Given his cavalier attitude about the law, the Court cannot understand why his practice should be allowed to continue.  Indeed, his conduct in this Court forfeits that privilege.

This Court has the inherent authority to regulate the practice of lawyers before it. Effective immediately, Mr. Wayland is barred from representing any clients before the undersigned Judge.  The Court recommends that Mr. Wayland be disbarred from practice before the United States District Court for the Southern District of Texas and that he be disbarred from the State Bar of Texas.  Accordingly, pursuant to Rule 8.03 of the Texas Disciplinary Rules of Professional Conduct, the clerk is directed to provide a copy of this memorandum opinion to the State Bar of Texas.  Pursuant to Rule 5 of the Rules of Discipline of the United States District Court of the Southern District of Texas, a copy of this memorandum opinion shall be provided to Chief Judge Hayden Head.

Mr. Wayland's conduct is so serious that others must also be deterred from engaging in similar conduct.   Although a sanction of the magnitude imposed in *Chambers* may be appropriate based on Mr. Wayland's conduct, the limited evidence before the Court is that Mr. Wayland is just returning to his law practice and has limited means.  The least severe monetary sanction that will have any meaning given the nature of his conduct is $25,000.  Accordingly, the Court orders a $25,000 sanction.

As with Mr. Villegas, given the criminal nature of the conduct, punishment should best be left to the appropriate authorities. Accordingly, pursuant to 18 U.S.C. § 3057(a), this Court reports this matter to the United States attorney for the Southern District of Texas. The clerk shall forthwith transmit a copy of this memorandum opinion to the United States attorney.

**Timothy Byrd**

Comparatively, Mr. Byrd's conduct is less egregious than the conduct of Mr. Villegas or Mr. Wayland. Nevertheless, Mr. Byrd is the actor who actually signed TByrd's bankruptcy petition. He is the one that signed the acquisition documents (i.e., the promissory note and deed of trust) to acquire the BFG assets.

Mr. Byrd was willing to sign these highly significant documents in exchange for money. He knew that he was totally unaware of the substance of the transactions and was being used as a straw man for Mr. Wayland's representation of his Mexican investors.

Mr. Byrd recently completed his own bankruptcy proceeding. He worked for Mr. Wayland for $20.00 an hour. He is of modest means. The Court finds that even a minimal monetary sanction will deter similarly situated individuals from repeating the conduct. A $5,000 sanction is imposed.

However, Mr. Byrd continues to view himself as an innocent bystander, believing that he has done nothing wrong. He is wrong, but (like Mr. Wayland) simply does not recognize what he has done. Accordingly, for a period of three years from the effective date of the order issued against him, Mr. Byrd must obtain advance, written approval from a United States Bankruptcy Judge or a United States District Judge before he, or any entity controlled by him (directly or indirectly) files a petition under Title 11.

**Kelly McKinnis**

At the sanctions hearing, Mr. McKinnis fully appreciated the gravity of his conduct. Although the Court recognizes that the allegations against Mr. McKinnis are extremely serious, most have not been proven by clear and convincing evidence. In particular, the Court is not convinced by a clear and convincing standard that Mr. McKinnis knew or orchestrated any transfer of property out of BFG. Indeed, the Court is not convinced by a clear and convincing standard that Mr. McKinnis was aware of the transfer out of BFG until it had already occurred.

Nevertheless, the Court is clearly convinced that Mr. McKinnis knew that his assistance in the filing of the TByrd chapter 11 petition was wrong. Indeed, he testified that he initially refused to do so, and relented when his friend made him feel guilty. As an officer of the Court, Mr. McKinnis has a duty to protect the integrity of the Court. He cannot allow the Court's integrity to be compromised when a friend needs a favor.

The Court admonishes Mr. McKinnis for his conduct and imposes a minimal sanction of $5,000 for his conduct.

Rule 8.03 of the Texas Disciplinary Rules of Professional Conduct requires the reporting of conduct when there has been a violation of the Disciplinary Rules that "raises a substantial question as to a lawyer's honesty, trustworthiness or fitness as a lawyer in other respects..." Similarly, Rule 5 of the Southern District's Rules of Discipline requires that this Court notify the chief judge when a lawyer has engaged in "conduct which might warrant disciplinary action." In this case, Mr. McKinnis' conduct raises substantial questions. Although this Court does not make a recommendation of disbarment against Mr. McKinnis, the Court has a duty to allow appropriate authorities to investigate. Accordingly, pursuant to Rule 8.03 of the Texas Disciplinary Rules of Professional Conduct, the clerk is directed to provide a copy of this

23

memorandum opinion to the State Bar of Texas.  Pursuant to Rule 5 of the Rules of Discipline of the United States District Court of the Southern District of Texas, a copy of this memorandum opinion shall be provided to Chief Judge Hayden Head.

### Orders to be Issued

The four individuals should each be given an independent right to appeal the result. Accordingly, the Court is issuing separate orders imposing sanctions against the four individuals.

Signed at Houston, Texas on March 13, 2006.

Marvin Isgur
**UNITED STATES BANKRUPTCY JUDGE**